**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **MICHAEL EDWARD HAMMONDS, BILLY WAYNE NIPPER, and DEBBIE BLACK, individually, and MICHAEL EDWARD HAMMONDS and BILLY WAYNE NIPPER, AS CO-ADMINISTRATORS OF THE ESTATE OF BETTY JEAN NIPPER, DECEASED,** | |
| *Plaintiffs,* | **CIVIL ACTION NO.** |
| **v.** | **5:18-cv-00346-TES** |
| **GRAY TRANSPORTATION, INC.; MICHAEL G. ELIAS; RYDER TRUCK RENTAL; and HUDSON INSURANCE COMPANY;** | |
| *Defendants.* | |

**ORDER DENYING MOTION TO STAY AND**
**GRANTING MOTION TO DISMISS**

Before the Court is Defendants Gray Transportation, Inc. and Michael G. Elias's

Motion to Stay Proceedings Pending Resolution of Criminal Proceeding [Doc. 12] and

Defendant Hudson Insurance Company's Motion to Dismiss [Doc. 16]. After reviewing

the parties' submissions, the Court **DENIES** the Motion to Stay [Doc. 12] and **GRANTS**

the Motion to Dismiss [Doc. 16]. As the Court has now ruled on all of the pending motions

in this case, it **LIFTS** the stay it previously entered.

## BACKGROUND

This case arises out of a catastrophic auto accident that resulted in the severe injury and ultimate death of Betty Jean Nipper. [Doc. 1, at ¶ 23]. Plaintiffs alleges that at the time of the accident Ms. Nipper was driving a 2014 Honda Accord on Georgia Highway 257 in Dooly County, Georgia. [*Id.* at ¶ 20]. Plaintiffs further allege that Defendant Elias, a commercial truck driver employed by Defendant Gray Transportation and allegedly acting within the course and scope of his employment, was driving a freightliner truck owned by Defendant Ryder Truck Rental, Inc. ("Ryder") and allegedly following the Honda Accord "too closely" and "traveling at an excessive rate of speed." [*Id.* at ¶¶ 21 & 24]. The accident allegedly occurred when Ms. Nipper, after signaling her intent to turn, attempted to make a left hand turn off of Highway 257 into a driveway. [*Id.* at ¶ 20]. Plaintiffs maintains that, as Ms. Nipper began to turn, Defendant Elias "attempted to improperly change lanes in the area of a double yellow line/no passing zone to make an improper and unsafe passing maneuver" resulting in a "violent collision." [*Id.* at 22].

Following the accident, Plaintiffs Michael Edward Hammond, Billy Wayne Nipper, and Debbie Black—Ms. Nipper's surviving children—brought this action under Georgia's wrongful death statute. [*Id.* at ¶ 41]. Plaintiffs Hammond and Nipper also bring this action as co-administrators of Ms. Nipper's estate to recover for the pain and suffering she experienced as a result of this accident prior to her death. [Doc. 1, at ¶ 39]. Plaintiffs assert claims against Defendant Elias under general theories of negligence and

negligence *per se* and Defendant Gray Transportation under the doctrine of *respondeat superior* and for negligent hiring, retention, and entrustment; negligent training and supervision; violations "of the Federal Motor Carrier Regulations"; and "under principles of Georgia law applicable to joint ventures." [*Id.* at ¶¶ 32 & 34]. Plaintiffs also asserts claims against Defendant Ryder based on its alleged breached of a voluntarily assumed duty to vet drivers, including Defendant Elias, and under the doctrine of *respondeat superior* and principles of Georgia law applicable to joint ventures. [*Id.* at ¶ 35]. Finally, Plaintiff asserts claims against Defendant Hudson Insurance based on an excess indemnity agreement it had with Defendant Gray Transportation, a surety bond it filed for Defendant Gray Transportation, and for its breach of a voluntarily assumed duty to vet potential drivers. [*Id.* at ¶ 33].

In response to Plaintiffs' Complaint, Defendants filed the instant motions asking the Court to stay the proceedings and to dismiss the claims as to Defendant Hudson Insurance. *See generally* [Docs. 12 & 16].

A motion to dismiss tests the sufficiency of the allegations in a plaintiff's complaint. *Acosta v. Campbell*, 309 F. App'x 315, 317 (11th Cir. 2009). A complaint survives a motion to dismiss if it pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action" or "conclusory statements." *Iqbal*, 556 U.S. at 678. Thus, to decide whether a complaint

survives a motion to dismiss, district courts are instructed to use a two-step framework. *See McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). The first step is to identify the allegations that are "no more than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## DISCUSSION

### A.     Motion to Stay Proceedings [Doc. 12]

In their Motion to Stay Proceedings, Defendants Gray Transportation and Elias ask the Court to stay the proceedings until the state resolves its criminal charges against Defendant Elias. They argue that a stay is necessary to allow them full access to information essential to their defense. Specifically, Defendants Gray Transportation and Elias argue that Georgia Code Annotated § 50-18-72(4) prevents the disclosure of Georgia's investigative reports of the subject accident while the charges against Defendant Elias are pending.[1]

---

[1] Georgia Code Annotated § 50-18-72 provides in pertinent part:

> a) Public disclosure shall not be required for records that are: . . .
> (4) Records of law enforcement, prosecution, or regulatory agencies in any pending investigation or prosecution of criminal or unlawful activity, other than initial police arrest reports and initial incident reports; provided, however, that an investigation or prosecution shall no longer be deemed to be pending when all direct litigation involving such investigation and prosecution has become final or otherwise terminated; and provided, further, that this paragraph shall not apply to records in the possession of an agency that is the subject of the pending investigation or prosecution; and provided,

4

[Doc. 12, at p. 3]. They further argue that allowing this case to proceed places Defendant Elias "in the untenable position of not being able to respond to Plaintiffs' written discovery or otherwise testify in his own defense without waiving his Fifth Amendment rights in the underlying criminal charges." [*Id.*]. In response, Plaintiffs argue that Defendants should not be permitted to delay the proceedings when only a small portion of discovery will overlap with information protected by the Fifth Amendment. [Doc. 25, at p. 3].

The Court finds that a stay is not appropriate in this case and therefore denies Defendants Gray Transportation and Elias's motion. The decision to grant a stay of this type is squarely within the Court's discretion. *See* [[Doc. 12, at p. 2]; [Doc. 25, at p. 4]; Fed. R. Civ. P. 26(d)Fed. R. Civ. P. 26(d). Other courts confronted with similar situations have identified several useful factors in guiding the Court's exercise of its discretion but none of these factors are binding or dispositive. *See Golden Quality Ice Cream Co. v. Deerfield Specialty Papers*, 87 F.R.D. 53, 56 (E.D. Pa. 1980); *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*, 886 F. Supp. 1134 (S.D.N.Y. 1995). *But see Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 99 (2d Cir. 2012) ("These tests, however, no matter how carefully refined, can do no more than act as a rough guide for the district court as it exercises its discretion."). Of these cases, the Court finds the factors outlined in *Golden Quality Ice Cream Co.* particularly helpful in deciding this motion. In *Golden Quality Ice Cream Co.*, the court

---

further, that the release of booking photographs shall only be permissible in accordance with Code Section 35-1-18 . . . .

5

considered the following factors in deciding whether to stay a civil case during the pendency of a parallel criminal case:

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

87 F.R.D. 53, 56 (E.D. Pa. 1980).

Applying these factors to this case, the Court is persuaded that a stay is not warranted. The Court is sympathetic to the emotional and financial toll that protracted litigation would have on Plaintiffs and gives great weight to their desire to resolve this dispute expeditiously. [Doc. 25, at p. 6]. The Court is, of course, aware of the difficulties that allowing this case to proceed may impose on Defendants. That said, Defendants were short on specifics as to how the lack of access to certain investigative reports would uniquely prejudice them. Defendants' arguments on this point are little more than speculation. After all, it may well be the case that the reports are of no value to them whatsoever or that the reports actually damage their legal position—a fact Plaintiffs aptly note. *See* [*Id.* at p. 7] ("[Defendant Elias] has the same equal access to law enforcement

reports regarding the wreck report as Plaintiffs."). The Court will not allow this case to linger to avoid such speculative harms.[2]

Defendants' arguments with regard to Defendant Elias's Fifth Amendment rights are less speculative, but ultimately unconvincing. It seems plausible that Defendant Elias will have to contend with the adverse inferences that are permitted in a civil case when a party invokes his Fifth Amendment rights for purposes of a parallel criminal proceeding. *See United States v. Two Parcels of Real Prop. Located in Russell Cty.*, 92 F.3d 1123, 1129 (11th Cir. 1996) (authorizing negative inference in civil proceeding where a plaintiff invokes Fifth Amendment rights to avoid self-incrimination in parallel criminal proceeding). However, such adverse inferences are only permitted "when independent evidence exists of the fact to which the party refuses to answer." *Joe Hand Promotions, Inc. v. Chios, Inc.*, 544 F. App'x 444, 446 (5th Cir. 2013) (quoting *Doe ex rel. Rudy–Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)). This requirement substantially mitigates the risk of undue prejudice that Defendants complain of so that any such prejudice is outweighed by Plaintiffs' interest in expeditiously resolving this case.

---

[2] The Court finds that the same reasoning applies to Defendant Gray Transportation's argument that Defendant Elias's invocation of his Fifth Amendment rights will prejudice their ability to fully investigate possible defenses. Defendant Gray Transportation did not specify which defenses they believe Defendant Elias has locked away and only vaguely argued that he may know something of value to their defenses. Regardless, Defendant Elias is represented by counsel so that anything he might tell them is covered by an attorney-client privilege every bit as forceful and effective as the privilege he shares with his criminal counsel. The Court knows of (and Defendants cite to none) no authority that would allow one set of lawyers to deny another set of lawyers *for the same party* from speaking with their mutual client.

The Court's interest in resolving this case quickly and efficiently also weighs against the risk of prejudice about which Defendants Gray Transportation and Elias complain. Defendants offered no evidence (or even conjecture) as to when Defendant Elias's criminal charges will be resolved. In light of the lack of information on this issue, the Court fears that granting this stay will be the first chapter in a multi-year saga in what should be a relatively straightforward auto accident case. The Court acknowledges that by granting the stay, it would essentially place this case on the shelf to gather dust thereby drawing little from the Court's scant resources. Nevertheless, even cases on the shelf require periodic maintenance like regular communication with the parties for status updates.

The case does not implicate the final two factors —the interests of parties not involved in litigation and the interests of the public—identified in *Golden Quality Ice Cream Co*s. Having weighed the equities of the situation, and exercising its considerable discretion, the Court concludes that granting a stay is unwarranted. Plaintiffs' interest in quickly resolving their dispute and the Court's interest in judicial efficiency outweigh the countervailing interests Defendants Gray Transportation and Elias assert. Accordingly, the Court denies the motion to stay.

**B.**    **Motion to Dismiss [Doc. 16]**

In the second motion before the Court, Defendant Hudson Insurance argues that the Court should dismiss Plaintiffs' claims against it because it is not subject to direct action under Georgia law. It further argues that Plaintiffs did not plead sufficient facts to

support their claim against it in tort. As discussed below, the Court agrees as to both of these issues and dismisses Plaintiffs' claims against Defendant Hudson Insurance.

A motion to dismiss tests the sufficiency of the allegations in a plaintiff's complaint. *Acosta v. Campbell*, 309 F. App'x 315, 317 (11th Cir. 2009). A complaint survives a motion to dismiss if it pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action" or "conclusory statements." *Iqbal*, 556 U.S. at 678. Thus, to decide whether a complaint survives a motion to dismiss, district courts are instructed to use a two-step framework. *See McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). The first step is to identify the allegations that are "no more than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

1.    Direct Action

To help clarify the arguments the parties are making, the Court briefly recounts the history of Georgia's direct-action statute. The traditional, common-law rule was that "a plaintiff does not have standing to bring a direct action against a defendant's insurance company unless the plaintiff has obtained a judgment against the defendant that remains

unsatisfied." *Flanders v. Jackson*, 810 S.E.2d 656, 658 (Ga. Ct. App. 2018) (quoting *Atl. Specialty Ins. Co. v. Lewis*, 802 S.E.2d 844, 848 (Ga. Ct. App. 2017)) (internal quotations omitted). The reasoning behind this rule was that the plaintiff was not in privity of contract with the insurer; therefore, he did not have a cause of action in contract to enforce the underlying obligation. *See Hartford Ins. Co. v. Henderson & Son, Inc.*, 371 S.E.2d 401, 402 (Ga. 1988). This rule persists as to most insurance contracts unless derogated by statute or a provision of the underlying insurance contract. *Id.*

In the case of motor carriers, [3] the Georgia General Assembly altered the common law rule in 1937 when it enacted a direct-action statute that allowed a plaintiff to join the motor carrier and its insurance carrier or surety bond issuer in a single action. *See* 1937 Ga. Law 729. That version of the statute stated that

> It shall be permissible under this article for any person having a cause of action arising under this article in tort or contract to join in the same action the motor carrier and its surety, in the event a bond is given. If a policy of indemnity insurance is given in lieu of bond, it shall be permissible to join the motor carrier and the insurance carrier in the same action, whether arising in tort or contract.

---

[3] The term "motor carrier" is currently defined in Georgia (subject to some exceptions) as:

> Every person owning, controlling, operating, or managing any motor vehicle, including the lessees, receivers, or trustees of such persons or receivers appointed by any court, used in the business of transporting for hire persons, household goods, or property or engaged in the activity of nonconsensual towing pursuant to Code Section 44-1-13 for hire over any public highway in this state.

Ga. Code Ann. § 40-1-100(12)(A). *See also* Ga. Code Ann. § 40-1-100(12)(B) (listing exceptions to general definition of "motor carrier"). The Court notes that the parties agree that Defendant Gray Transportation is a motor carrier as defined by Georgia law.

*Id.* (emphasis added). This version of the statute remained in effect until 2002 when the Georgia General Assembly amended it to remove any reference to the issuer of a surety bond. *See* S.B. 488 2001-2002 Gen. Assemb., Reg. Sess. (Ga. 2002). The 2002 version of the direct-action statute stated: "It shall be permissible under this article for any person having a cause of action arising under this article to join in the same action the motor common carrier or motor contract carrier and the insurance carrier, whether arising in tort or contract." *Id.* Critically, the Georgia General Assembly maintained this wording when it extensively amended Georgia's motor carrier laws in 2012. *See* Georgia Motor Carrier Act of 2012, 2011 Ga. HB 865. In fact, the only action the General Assembly took with regard to the direct-action statute in 2012 was to recodify it at Georgia Code Annotated § 40-1-112 and include an identical provision at Georgia Code Annotated § 40-2-140. In short, in the 80 years since the Georgia General Assembly enacted this direct-action statute, the only substantial change it has made was to remove any procedural avenue for a plaintiff to bring a direct action against an issuer of a surety bond.

Also relevant to this dispute is the regulatory authority associated with the direct-action statute. In 1929, the Georgia General Assembly delegated rulemaking authority to the Georgia Public Service Commission ("GPSC") to implement rules for the administration and oversight of motor carriers. *See* 1929 Ga. Laws 295–96; Ga. Code Ann. §§ 46-7-1 & 46-7-2, *repealed by* The Georgia Motor Carrier Act, Ga. L. 2012, p. 580, § 16/HB 865 (2012). Exercising this authority, the GPSC enacted Rule 515-16-11-.03(4) of the Rules

of Georgia Public Service Commission, which authorized a direct action against the issuer of a surety bond and the issuer of an indemnity insurance policy given in lieu of a bond. *See* Rule of Ga. Pub. Safety Comm'n 515-16-11-.03(4) ("It shall be permissible under this rule for any person having a cause of action arising under this rule in tort or contract to join in the same action the motor carrier and its surety, in the event a bond is given."). Then, in 2012, the Georgia General Assembly transferred regulatory authority over motor carriers from the GPSC to the Georgia Department of Public Safety ("GDPS"). *See* Ga. Code Ann. § 40-1-54(a). However, the Motor Carrier Act of 2012 did provide that

> Rules, orders, and regulations previously adopted which relate to functions performed by the Public Service Commission which were transferred under this article to the Department of Public Safety shall remain of full force and effect as rules, orders, and regulations of the Department of Public Safety until amended, repealed, or superseded by rules or regulations adopted by the department.

Ga. Code Ann. § 40-1-57. As of the day of this order, the GDPS has not "amended, repealed, or superseded" Rule 515-16-11-.03(4).

Having recounted a brief history of Georgia's direct-action statute, the Court turns to the parties' arguments. Plaintiffs maintain in their Amended Complaint that Defendant Hudson Insurance is subject to a direct action because Rule 515-16-11-.03(4) is still in force based on Georgia Code Annotated § 40-1-57. [Doc. 20, at ¶ 23]. Defendant Hudson Insurance argues that the Georgia Court of Appeals "rejected this very argument" in *RLI Insurance Co. v. Duncan*, 815 S.E.2d 558 (2018), when it held that an excess liability insurer that also issued a surety bond was not subject to a direct action.

[Doc. 16, at pp. 7–9]. Plaintiffs dispute the applicability of *RLI Insurance Co.* because "the ONLY basis that plaintiff [in *RLI Insurance Co.*] specifically pleaded and asserted for direct action against the insurer was pursuant to [Georgia Code Annotated] § 46-7-12, which only mentions joining an insurance carrier and not a surety company issuing a public liability surety bond." [Doc. 24, at p. 12] (emphasis in original). In short, Plaintiffs believe that the plaintiff in *RLI Insurance Co.* "overlooked and failed to raise" Rule 515-16-11-.03(4)'s authorization to bring suit against a surety bond issuer. [*Id.*]. In its final volley, Defendant Hudson Insurance disputes the ongoing validity of Rule 515-16-11-.03(4) because the Motor Carrier Act of 2012 repealed the code sections authorizing the GPSC to promulgate said rule. [Doc. 26, at p. 3].

After considering the parties' thorough briefing, and with the benefit of a hearing, the Court finds that the direct action against Defendant Hudson Insurance Co. cannot be maintained under Georgia's direct-action statute or Rule 515-16-11-.03(4) because the plain texts of the current version of Ga. Code Ann. §§ 40-1-112(c) & 40-2-140(d)(4) only allows for direct actions against "insurance carriers". As the parties' arguments demonstrate, this question implicates multiple sources of Georgia law that complicate the Court's analysis.

The Court begins with Defendant Hudson Insurance Co.'s contention that *RLI Insurance Co.* is dispositive on this issue.[4] In *RLI Insurance Co.*, the plaintiff brought suit against a trucking company and its insurer for injuries sustained in a collision with one of the trucking company's trucks. 815 S.E.2d at 559. The insurer, which issued a surety bond and an excess liability policy to the trucking company, moved for summary judgment on the grounds that it was the trucking company's excess liability insurer and therefore not subject to a direct action. *Id.* The trial court denied the motion, but granted the insurance company's request for an interlocutory appeal. *Id.* On appeal, the court held that the insurance company, as an excess liability insurer, was not subject to a direct action. *Id.* at 560 (citing *Werner Enters., Inc. v. Stanton*, 690 S.E.2d 623 (Ga. Ct. App. 2010). While the court acknowledged that the excess liability insurer also issued a surety bond to the trucking company, it did not discuss the impact, if any, the surety bond had on its

[4] The Court ultimately resolves this dispute on a point of statutory interpretation. However, under the *Erie* Doctrine, the Court must follow the law as announced by the state courts even if the Court disagrees with how the state court ruled on a question of statutory interpretation. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."). *See also Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 881 F.3d 835, 848 (11th Cir. 2018) (holding that federal courts must apply state court decisions even if they disagree with the decisions). Granted, *RLI Insurance Co.*, the state court decision at issue in this case is not a decision of the highest court in Georgia. Later Eleventh Circuit cases have held that federal courts must "adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson, & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983). Accordingly, the Court begins its analysis with *RLI Insurance Co.*, the proffered state court case, and concludes that it does not resolve the dispute in this case, thereby necessitating the Court's subsequent statutory analysis.

decision nor did it discuss (or even mention) Rule 515-16-11-.03(4).[5] In light of the lack of

discussion regarding the surety bond and Rule 515-16-11-.03(4) in *RLI Insurance Co.*, the

Court is persuaded by Plaintiff's argument that *RLI Insurance Co.* is not dispositive.

Nevertheless, the Court finds that *RLI Insurance Co.* does hint at what the Court

now concludes: that Rule 515-16-11-.03(4) no longer allows a direct action against the

issuer of a surety bond. The Court acknowledges that when the Georgia General

Assembly passed the Motor Carrier Act of 2012, it maintained in force the rules that the

GPSC enacted regarding motor carriers. *See* Ga. Code Ann. § § 40-1-57. However, those

rules only remained in effect to the extent they were not later repealed by the GDPS or

overridden by an act of the Georgia General Assembly. *See id.* The parties agree that the

GDPS took no action to amend Rule 515-16-11-.03(4). Therefore, Rule 515-16-11-.03(4) is

still in effect—unless the Georgia General Assembly repealed it as part of the Motor

Carrier Act of 2012.

Whether the Motor Carrier Act of 2012 repealed Rule 515-16-11-.03(4) is a question

of statutory interpretation—specifically, the meaning of "insurance carrier" as used in

Georgia Code Annotated §§ 40-1-112(c) & 40-2-140, the two direct action statutes. These

code sections contain identical provisions that state: "It shall be permissible under this

article for any person having a cause of action arising under this article to join in the same

---

[5] Interestingly, this Court could not find a single case citing Rule 515-16-11-.03(4).

action the motor common carrier or motor contract carrier *and the insurance carrier,* whether arising in tort or contract." (emphasis added).

When interpreting a state's statutes, the Court applies that state's rules of statutory interpretation. *See Robbins v. Garrison Prop. & Cas. Ins. Co.,* 809 F.3d 583, 586 (11th Cir. 2015). Under Georgia law,

> A statute draws its meaning from its text. When we read the statutory text, we must presume that the General Assembly meant what it said and said what it meant, and so, we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. The common and customary usages of the words are important, but so is their context. For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question.

*City of Marietta v. Summerour,* 807 S.E.2d 324, 328 (Ga. 2017) (internal quotations and citations omitted). The Court's interpretation of Georgia's direct-action statute is further guided by the frequently-recited rule that the direct-action statute is in derogation of the common law and therefore must be strictly construed. *See RLI Ins. Co.,* 815 S.E.2d at 560. Viewing the present dispute through this analytical framework, the question is whether "insurance carrier" includes a company that issues a surety bond.

The Court begins its analysis with the meaning of the phrase "insurance carrier" in isolation and finds that an insurance carrier is distinct from the issuer of a surety bond because a surety bond is plainly not the same as an insurance contract. In the context of a surety bond, the surety only becomes liable in the event that the primary obligor—in

this case Defendant Gray Transportation—is unable to meet its obligations. By contrast, an insurer provides an indemnity to the insured in the event they incur a liability. Although this distinction is not relevant for purposes of this dispute, it is relevant to the extent that it demonstrates that a an "insurance carrier" is distinct from a surety bond issuer.[6] Because these two arrangements are distinct, the Court simply cannot say that the issuer of a surety bond is an "insurance carrier" for purposes of Georgia's direct-action statute.

Moving beyond the isolated phrase "insurance carrier" into the broader language of Georgia Code Annotated §§ 40-1-112 & 40-2-140 confirms the Court's conclusion. *See Mornay v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 769 S.E.2d 807, 810 (Ga. Ct. App. 2015) ("[C]ourts may look to other provisions of the same statute to determine the meaning of a particular statutory provision."). Sections 40-1-112(a) & (b) and Sections 40-2-140(d)(2) & (3) repeatedly refer to "a policy of *indemnity* insurance"—indicating that the statute only applies to indemnity agreements rather than suretyship agreements. The statutory text's focus on indemnity agreements rather than some other contractual

---

[6] As discussed below, earlier versions of Georgia's direct-action statute expressly authorized an action against either the motor carrier's insurance carrier or the issuer of its surety bond. The fact that the General Assembly specifically authorized direct actions against both surety bond issuers and insurance carriers confirms that the two are distinct and that the General Assembly is aware of the distinction.

relationship confirms that "insurance carrier" means the provider of an insurance policy rather than the issuer of a surety bond.[7]

Finally, the Court considers prior versions of Georgia's direct-action statute. The Georgia Supreme Court has frequently noted the importance of the development of a statute over time in interpreting that statute's meaning. For example, in *Jones v. Peach Trader, Inc.*, the Georgia Supreme Court held that "changes in statutory language generally indicate an intent to change the meaning of the statute." 807 S.E.2d 840, 847 (Ga. 2017) (quoting *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1299 (11th Cir. 2010)); *see also Clarke v. Johnson*, 33 S.E.2d 425 (Ga. 1945) ("A constitutional provision must be presumed to have been framed and adopted in the light and understanding of prior and existing laws and with reference to them. Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption."). Likewise, continuity in a statute's language can provide significant insight into how that statute is to be understood. *See Elliott v. State*, S18A1204, 2019 WL 654178, at **3–4 (Ga. Feb. 18, 2019).

As recounted above, Georgia's direct-action statute has an extensive history of both continuity and change. Significant for present purposes, however, is the change in the wording of the statute in 2002 to exclude any reference to the issuer of a surety bond and the continuation of that exclusion in the 2012 version of the statute. The Court finds

---

[7] The emphasis on indemnity insurance rather than some other form of proof of financial responsibility was what led the Georgia courts to conclude that the direct-action statute did not authorize a direct action against an excess liability insurer. *See Jackson v. Sluder*, 569 S.E.2d 893, 898 (Ga. Ct. App. 2002).

that this is strong evidence that the current version of the direct-action does not permit a direct action against the issuer of a surety bond. Drawing on the guidance in *Jones*, the Court must interpret these changes as deliberate decisions by the Georgia General Assembly to exclude surety bonds from the reach of Georgia's direct-action statute.

Because the Court finds that the Motor Carrier Act of 2012 does not authorize direct actions against the issuers of surety bonds, it must conclude that the General Assembly necessarily and effectively repealed Rule 515-16-11-.03(4) to the extent it authorized a direct-action against any entity other than an "insurance carrier." It would, after all, make little sense for the legislature to restrict the direct-action statute to "insurance carriers" in the plain text of the statute itself, yet allow an agency rule to directly contravene the plain language of the authorizing statute. Thus, it is of no consequence that the GDPS has not acted to amend or repeal the rule in question because the General Assembly itself repealed it when it limited the application of the direct-action statute to "insurance carriers" in the 2002 version of the statute and reiterated the restriction in the 2012 version.

The Court therefore grants Defendant Hudson Insurance Co.'s Motion to Dismiss as it relates to Plaintiffs' direct-action claims based on Rule 515-16-11-.03(4).

   2.   *Tort/Discovery*

In addition to their claims under Georgia's direct-action statute, Plaintiffs assert claims against Defendant Hudson Insurance Co. in tort. They allege that Defendant

Hudson Insurance Co. "assumed the legal duty to monitor, screen and to disqualify or refuse to approve drivers of Gray Transportation." [Doc. 1, at § 33]. However, Plaintiffs essentially concede that they currently have no evidence that Defendant Hudson Insurance Co. voluntarily assumed the duty to vet Defendant Gray Transportation's drivers, but argues that they would like the benefit of discovery to investigate the existence of a contract or practice where Defendant Hudson Insurance assumed the alleged duty. *See* [Doc. 24, at p. 14]. Of course, at the motion-to-dismiss stage of the proceedings, Plaintiffs do not need evidence to support each of their allegations—but their complaint must include sufficient "factual enhancement" to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

What might sufficient "factual enhancement" have looked like in this case? For starters, Plaintiffs could have alleged how Defendant Hudson Insurance Co. assumed the duty to vet Defendant Gray Transportation's drivers. Did it do so through a contract? Or simply as a matter of practice? Plaintiffs could have also alleged what this vetting process entailed, how long Defendant Hudson Insurance had been vetting Defendant Gray Transportation's drivers, or whether they actually vetted Defendant Elias. The Court acknowledges that without discovery Plaintiffs may not have access to this information but Plaintiffs' allegations (at this point) amount to little more than speculation about a possible relationship between Defendants Gray Transportation and Hudson Insurance Co. In sum, Plaintiffs' allegation of a voluntarily assumed duty "gets the complaint close

to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal citations omitted). The Court notes that as discovery proceeds, information may well come to light that allows Plaintiffs to allege a voluntarily assumed duty with more particularity and the Court would certainly entertain a motion to amend their complaint at that point in time.

Plaintiffs' Restatement (Second) of Torts, § 324A(c) claim is also deficient because they failed to plead that Defendant Gray Transportation relied on Defendant Hudson Insurance Co.'s alleged vetting process. In *Hutcherson v. Progressive Corp.*, the Eleventh Circuit acknowledged that Georgia law requires a plaintiff asserting a claim under Restatement (Second) of Torts § 324A(c) to prove that her injuries were caused by a party's reliance on another party's voluntarily assumed duty. 984 F.2d 1152, 1157 (11th Cir. 1993). *Hutcherson* made clear that this standard is low and plaintiff may rely on circumstantial evidence to survive a motion for summary judgment. *Id.* In this case, however, Plaintiffs makes no allegation whatsoever that Defendant Gray Transportation relied in any way on Defendant Hudson Insurance Co.'s alleged vetting process. Accordingly, Plaintiffs' failure to allege reliance by Defendant Gray Transportation is an alternative basis for dismissal for this tort claim against Defendant Hudson Insurance Co.

## CONCLUSION

For the above reasons, the Court **DENIES** the Motion to Stay Pending Resolution of the Criminal Proceedings [Doc. 12] and **GRANTS** the Motion to Dismiss [Doc. 16].

**SO ORDERED** this 22nd day of February, 2019.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**